Patricia K. PRICE, Plaintiff,

v.

CANNON MILLS COMPANY, Defendant.

No. C–82–540–S.

United States District Court, M.D. North Carolina, Winston-Salem Division.

April 23, 1985.

Jonathan Wallas, Charlotte, N.C., for plaintiff.

Susan Hartzoge, Kannapolis, N.C., Wayne S. Bishop and Bruce L. Downey, Washington, D.C., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ERWIN, District Judge.

Plaintiff Patricia K. Price filed this action on May 11, 1982 alleging that defendant Cannon Mills Company, in discharging her from her employment, discriminated against her because of her sex and in retaliation for her pursuing her rights under Title VII, in violation of Title VII of the Civil Rights Act of 1964, as amended.[1]

The matter was tried before the court on April 18, 19, 24, 25, and 26, 1984 in Winston-Salem. The court allowed the parties to file proposed findings of fact, conclusions of law, and trial briefs after they received copies of the trial transcript. The transcript was filed on September 21, 1984. The court entered an order on October 24, 1984 requiring defendant to file post-trial documents on or before November 19, 1984 and requiring plaintiff to respond on or before December 11, 1984. Defendant filed its post-trial brief, proposed findings of fact, and conclusions of law on November 27, 1984. Plaintiff filed her responses to the same on December 24, 1984. Defendant filed a reply brief on January 11, 1985, and plaintiff filed a response to the reply brief on January 30, 1985.

*Findings of Fact*

1. Plaintiff is a female citizen and resident of Rowan County, North Carolina. Defendant Cannon Mills Company (hereinafter Cannon) is a North Carolina corporation presently doing business in Cabarrus County and other counties in North Carolina. Cannon is in the business of producing textile products and is an employer as defined by 42 U.S.C. § 2000e(b).

2. On or about March 1, 1965, the plaintiff began work at Cannon as a learner hemmer. She voluntarily severed her employment with the company on April 24, 1967 and was reemployed on or about September 1, 1967 as a shearing machine operator. On or about January 1, 1968, plaintiff was employed as a gray room helper in

---

1. 42 U.S.C. §§ 2000e–2000e–10.

the Bleachery Department. On or about March 25, 1971, she was transferred to the position of preference styles in the Bleachery Department until July 17, 1972. On that date, plaintiff became a timekeeper in the same department. On or about May 26, 1977, plaintiff was promoted to the position of chemical reports and records. On or about September 1, 1979, she was promoted to the job of administrative foreman in the Wet Finishing Office. She was employed in that position until she was involuntarily discharged on or about April 30, 1981. It is her discharge that is the subject of this action.

3. The plaintiff filed charges of sex discrimination against Cannon with the Equal Employment Opportunity Commission (hereinafter EEOC) on August 20, 1977, March 16, 1979, January 28, 1981, and May 4, 1981. As of April 30, 1981, when the plaintiff was terminated, the charges of August 1977 and March 1979 had been settled. When plaintiff's August 1977 EEOC charge was settled, plaintiff and three other women received a raise in addition to a lump sum payment of $2,000 each. As a result of the settlement of plaintiff's 1979 EEOC charge, she was promoted to a supervisory position with Cannon. The EEOC charge of January 1981 in which plaintiff and others alleged systemic class-wide sex discrimination against Cannon was still pending with the EEOC at the time of trial.

4. On April 24, 1982, the plaintiff received a notice of right to sue from the EEOC based on her May 4, 1981 charge of discriminatory discharge. She filed this action within the ninety days prescribed by Title VII. This court, thus, has jurisdiction of this case, and venue is proper in this district.

5. It was Ms. Price's primary job responsibility in the Wet Finishing Facility to administer Cannon's job posting system. That system was established pursuant to a Consent Decree entered in *United States v. Cannon Mills Company*, No. C–65–S–69 (M.D.N.C. February 21, 1971), which was approved by this court. Under the decree,

notices of all non-supervisory job vacancies were to be posted on a bulletin board in the facility in which the vacancy occurred.

6. Ms. Price was responsible for posting job vacancy notices in the designated place within the Wet Finishing Facility. The notices were prepared by timekeepers upon the instructions of their department managers. Employees interested in filling the position would bid for a job by completing a bid form and giving it to the timekeeper in their department. After the bids were closed, the timekeeper would assemble the bids, attach each employee's service record to the bid, and transmit them to Ms. Price. Ms. Price was then to review the bids with the employees in the Special Projects Office and the job was awarded to the bidder entitled to the position under the rules established by the consent decree.

7. Qualifications and seniority were the two criteria established by the decree for selecting a successful bidder. As between qualified employees, the job was awarded to the bidder with the most seniority. The same applied when there were no qualified bidders.

8. The type of seniority used to select the successful applicant from the group of bidders depended upon whether an "affected class member" bid on the position. Affected class members were defined by the decree as black employees who, *inter alia*, had been continuously employed by Cannon since August 1, 1969. Ordinarily, jobs were awarded on the basis of departmental seniority. But the relevant criterion became company-wide seniority when an affected class member bid for a job.

9. Plaintiff held a number of non-supervisory job positions prior to being promoted to administrative foreman in September 1979. Plaintiff's job performance in these various non-exempt positions was good. A number of individuals with whom she worked and who supervised her, including Mr. S.B. Cooke and Mr. William Nunn, testified about plaintiff's good job performance in the various positions she held prior to the settlement of her second EEOC charge.

10. Prior to assuming her duties as administrative foreman in the Wet Finishing Department, plaintiff met with Mr. Jerry Goodson, Mr. Cooke, and Mr. Asbury Hudson to discuss her job duties. Although a list of her job duties was apparently prepared at that time, no such list was provided to the plaintiff.

11. According to the job description for plaintiff's administrative foremanship, duties included handling of facility agent work for Wet Finishing which involved implementation of defendant's post-bid system, cost control, work with respect to insurance and retirement issues, piece rate recording, supply surveillance, supervising timekeepers, and performing special projects when assigned.

12. More than one-half of plaintiff's time involved facility agent duties. The facility agent had primary responsibility for job posting and accumulation of job bids for hourly jobs in Wet Finishing. She posted jobs that needed to be filled after being advised to do so by the department supervisors. In addition, she accumulated job requests from that department, saw to it that records indicating employees' qualifications and length of service were attached, lined up employees who signed job postings by qualifications and seniority and then delivered the applications to the Special Projects Department which was ultimately responsible for the decision as to who would get the jobs. Under the post-bid system, the Special Projects Department made all final decisions about who would be awarded bids.

13. As the facility agent, plaintiff also had the responsibility to explain to employees how to move from one job to another, consistent with Cannon's post-bid system. She also advised employees that jobs would be posted and made efforts to assist people whose jobs were being discontinued or who had difficulty understanding the posting system. Plaintiff, thus, had direct contact with many employees and direct responsibility to provide practical advice about the post-bid system.

14. Plaintiff's immediate supervisor was Mr. S.B. Cooke. She also reported to Mr. Jerry Goodson, the department head. Other supervisors in Wet Finishing from whom plaintiff took instructions included Mr. William Nunn and Mr. Ken Branden.

15. Plaintiff and Mr. Cooke, on occasions, met with John Stanback, John Watson, Gary Barnes, and Jimmy Wallace to encourage them to sign up for jobs because their jobs were to be discontinued. Plaintiff was encouraged by Mr. Cooke and Charles Shuping to meet with these durable press (DP) range employees to assist them in understanding the options available to them in the post-bid system.

16. Plaintiff met with John Stanback and other DP range employees as a group, explaining to them that if they did not transfer prior to the elimination of their jobs, they would be placed into any available vacancy. The men expressed interest in first-shift jobs. Ms. Price suggested that they bid on second-shift or third-shift jobs in which they were interested and thereby get in the job category. Once in the job category, they could bid on future first-shift vacancies and have a much better chance to obtain one. The advice plaintiff gave to the DP range employees was proper and was similar to advice given by other facility agents.

17. On April 27, 1981, a job of dryer operator on the second shift was posted. This was the very job in which John Stanback and other DP range employees had expressed interest to plaintiff. By terms of the decree, the dryer operator job which was posted by 11:00 a.m. on April 27 would come down on April 29 at 11:00 a.m., after which bids would be closed. About 10:00 a.m. on April 29, plaintiff realized that none of the DP range employees had bid on the second-shift dryer operator job. Plaintiff telephoned the DP range about 10:15 a.m., and John Stanback answered the telephone. Plaintiff was not specifically calling Mr. Stanback but wanted to alert all the employees about a job vacancy. Plaintiff believed that Mr. Stanback and the other DP range employees did not under-

stand the post-bid system. Plaintiff suggested to Mr. Stanback that he and other DP range employees, Watson, Barnes, and Wallace, sign up for the second shift dryer operator job that was being posted if they still wanted that job.

18. When the plaintiff picked up the job bids at about 11:00 a.m. on April 29, she also picked up the files of all employees submitting bids in order to determine the jobs for which each was qualified. She first learned Mr. Stanback had affected class or "AC" status and that Mr. Stanback had bid on a first shift tenter operator job at the same time he bid on the second shift dryer operator position about which plaintiff had previously telephoned him. Although Mr. Stanback was not qualified to get the tenter operator job, he was the only "AC" to bid on it. The fact that he bid on the first shift tenter operator job changed the measure of seniority to be used for selection from department seniority to company seniority under the terms of the consent decree. If no "AC" had bid, department seniority would control, and the job would go to Connie Greason, plaintiff's first cousin. If Mr. Stanback's bid was considered, company seniority would be utilized, and the first shift tenter operator position would go to Lloyd Brendle. Ms. Price realized her previous action in advising Mr. Stanback and the other DP range employees about the posting for the second shift dryer operator job had perhaps affected the selection process. Mr. Stanback had signed up for both the first shift tenter operator job and the second shift dryer operator job after her telephone call. She believed that Mr. Stanback would not have signed up for any job if she had not telephoned. She felt her telephone call, albeit made with good intentions, may have affected the bidding and selection process. The fact that her cousin was involved in the bid had no effect on her actions.

19. Plaintiff spoke to Lowell Lovin, a supervisory employee in Special Projects to whom she reported on matters concerning the post-bid system. She explained to Mr. Lovin what had happened and advised Mr. Lovin that she believed Mr. Stanback would not have signed up for the job if she had not called. She told Mr. Lovin that if Mr. Stanback's application was considered, a different employee would have been given the first shift tenter operator job and that if Mr. Stanback withdrew his application, her cousin would receive the job. Ms. Price knew that it was the duty of Special Projects to make final decisions about the awarding of job bids, and she, therefore, sought instructions from Mr. Lovin who had the final responsibility for awarding the job. Mr. Lovin told plaintiff to ask Mr. Stanback if he wanted to withdraw his application. Mr. Lovin further stated that if Mr. Stanback decided to withdraw, she should have Mr. Stanback to sign something. It was Mr. Lovin who made the decision that plaintiff should talk to Mr. Stanback about withdrawal. Mr. Lovin never told plaintiff that it would be improper to have Mr. Stanback withdraw his application.

20. When Mr. Stanback's application reached Mr. Lovin, he prepared a Form 109 awarding the first shift tenter operator job to Lloyd Brendle. Mr. Stanback's application was the only one submitted by an "AC." Mr. Lovin knew when he allowed plaintiff to speak to Mr. Stanback that if he withdrew his application, a new Form 109 would have to be prepared awarding Ms. Greason the job.

21. Mr. Price went to Mr. Stanback and explained to him that by signing up for the first shift tenter operator job, a job for which Mr. Stanback was not qualified, he had affected the way the selection would be made. Mr. Stanback indicated that he did not want to hurt anyone and asked what he could do to remedy the situation. Plaintiff then advised Mr. Stanback that he could withdraw his application. Ms. Price neither told Mr. Stanback he had to withdraw his bid nor pressured him to do so. Mr. Stanback testified at trial that it was his idea to withdraw his bid:

Q Now when Ms. Price came back and talked to you around 11:15, did she tell you that you had to withdraw your bid?

A   No.

Q   In fact, that was your idea to withdraw your bid, wasn't it?

A   Right.

Q   And you then called Ms. Hilton, is that correct?

A   Right.

Q   And Ms. Hilton tried to talk you out of withdrawing your bid, didn't she?

A   Right.

Q   You told Ms. Hilton no, you wanted to withdraw your bid?

A   Right.

Trial Transcript at 3–155–56.[2]   He thereafter called time-keeper Sandra Hilton and told her he desired to withdraw his bid. Ms. Hilton discouraged him from withdrawing, but Mr. Stanback said he wanted to withdraw, and his request was communicated to Mr. Lovin who eliminated Stanback's name from consideration.  Mr. Lovin, or someone else in Special Projects at his direction, typed the phrase "I herby [sic] withdraw my reguest [sic] for this job" on Mr. Stanback's Job Vacancy Request for the first shift tenter operator job. As a result, Connie Greason, who had more departmental seniority than any other bidder, was awarded the job.  Mr. Lovin was a crucial witness to the defendant's case and was available to testify at trial, but he was not called by the defendant.  Therefore, Ms. Price's evidence on these events with Mr. Lovin is uncontradicted.  In view of this, the court draws a reasonable inference that Mr. Lovin would have testified as did the plaintiff regarding these events.

22.  There had been other occasions when timekeepers had been requested by employees to withdraw their job bids, and it had been done.  No discipline had been imposed for such actions.  As Sandra Hilton, a timekeeper at Cannon, testified:

Q   Were you deposed in this matter? Did I take your deposition?

A   Yes, you did.

Q   Referring to your deposition to page 23, line five, did I ask you this question. "Had there ever been any time before that date, Ms. Hilton, when a person, an employee, who had signed a job vacancy request had requested to withdraw that request, come to you and wanted to withdraw their job vacancy request?"  And was your answer, "Yes, but not often. That is real unusual that they do that."

A   That was my answer.

Trial Transcript at 4–226.

23.  Plaintiff had no final responsibility for who was selected for the first shift tenter operator job.  She cleared all of her actions with Mr. Lovin who never suggested she was acting improperly.  Plaintiff did not try to cover up her actions.  During the morning and early afternoon of April 29, she spoke openly with Mr. Lovin, Mr. Cooke, Mr. Nunn, and Mr. Branden, among others, about what she was doing and explained to them what had happened that day concerning Mr. Stanback's bid and what she was doing to remedy the problem. Plaintiff specifically mentioned to these men that her cousin Connie Greason was involved in the matter.  None indicated that her actions were improper.

24.  Following Mr. Lovin's decision to allow Mr. Stanback to withdraw his application, Mr. Goodson learned from Mr. Shuping that a job apparently had been first awarded to Lloyd Brendle but had then been awarded to Connie Greason by Mr. Lovin.  Mr. Goodson reported the matter to Mr. William Murdoch, who was then the senior vice president of the company and the director of manufacturing.  Mr. Murdoch conducted what he termed an investigation of the incident.  However, Mr. Murdoch never permitted the plaintiff to give her version of the incident and neither

**2.**  Mr. Stanback's statement reads:

Pat Price tells us when we should go sign up for jobs.  She came by and told me I should sign up for a dryer job on the 2nd shift and a tenter job on the 1st shift.

She came back later in the day and told me I wouldn't get that tenter job on 1st shift and

that I was hurting someone else's chances by keeping my request in.  I told her that I didn't want to hurt anyone else so I would withdraw my request.

Pat Price also told me this would not effect [sic] my AC (Affected Class) status.
Plaintiff's Exhibit 17.

sought nor obtained a number of material facts pertinent to why and how Mr. Stanback had been allowed to withdraw his application for the first shift job. Although Mr. Murdoch instructed Mr. Goodson to conduct an investigation, and although Mr. Murdoch talked to Mr. Stanback, Mr. Goodson failed to report a number of pertinent facts to Mr. Murdoch. Further, Mr. Stanback was not asked a number of important background questions which would have made the full nature of the facts available to Mr. Murdoch prior to the time he made the decision to terminate the plaintiff on April 30, 1981. Neither Mr. Goodson nor Mr. Murdoch ever gave Ms. Price an opportunity to explain her actions.

25. On April 30, Mr. Murdoch convened a meeting with Ms. Price, Mr. Goodson, and Mr. Hudson and advised plaintiff that she was terminated. The decision to fire Ms. Price had been made before the meeting. Ms. Price requested an opportunity to tell her side of the story and to explain exactly what had happened. Mr. Murdoch refused to give her an opportunity to explain the situation. Ms. Price requested that Mr. Stanback be brought in to meet with Mr. Murdoch and her, but Mr. Murdoch refused to do so. Ms. Price tried to advise him that what Mr. Stanback had told him was not the complete story, but Mr. Murdoch would not listen. It is rare, indeed, that an employee may explain his side of an event and make a written statement about the same, and yet, an administrative foreman cannot. This circumstance gives rise to an inference "of getting the administrative foreman." Mr. Murdoch purported to base his decision to terminate plaintiff solely on his conversation with Mr. Stanback. Mr. Murdoch, however, knew that the company's post-bid system was a complicated one and that it was unlikely that Mr. Stanback fully understood that system.

26. The court finds that plaintiff was not fired because of her alleged manipulations of Cannon's post-bid system on April 29, 1981 and that the advanced reason was a pretext for retaliation. Manipulation is defined as "management with use of unfair, scheming, or underhanded methods esp. for one's own advantage." Webster's Third New International Dictionary 1376 (1981). The court further finds that on the basis of this definition, no manipulation or attempted manipulation occurred. All the events on this occasion were conducted by an administrative foreman. Nothing was covered up or attempted to be covered up. Mr. Lovin did not indicate any unfairness during the course of these events. If plaintiff had not pursued her Title VII rights, she would not have been terminated.

27. Only plaintiff was fired for the events of April 29, 1981. Mr. Lovin, as of trial, had not been disciplined. Other facility agents had previously made mistakes in the post-bid system. When such mistakes were made, they were corrected without discipline of the facility agent involved. Mr. Cooke testified that plaintiff generally did a good job in her supervisory position and that he had no problems with her work performance. He further stated that as of April 29, 1981, he knew no reason why plaintiff should be terminated. As Mr. Cooke testified:

MR WALLAS: Page 24, lines 11 through 25.

Q Let me ask this question first. Prior to April 29, 1981, had Mr. Goodson ever talked to you and asked you your opinion as to whether Ms. Price should be discharged?

A No, I don't recall any.

Q You don't recall any conversation like that?

A No.

Q Had you ever recommended to Mr. Goodson or anyone else in the company that she be discharged or be considered for termination?

A No.

Q Do you know of any reason, prior to April 29, 1981, that Ms. Price should have been discharged or should have been considered for discharge?

A No.

Trial Transcript at 2–149. Other employees of the company including Bill Nunn, Sharon Barger, and Rose Ross also testi-

fied that plaintiff generally did a good job and that they got along well with the plaintiff when they had occasion to deal with her in the course of her duties.

29. Neither Mr. Goodson nor any other manager ever told plaintiff that she was not performing some of the duties which she should in fact have been performing. Mr. Goodson admitted that plaintiff did all of her assigned work.

30. Defendant also contends that Ms. Price habitually failed to perform her facility agent duty of posting jobs on a regular basis. The evidence is to the contrary. Ms. Price normally posted all jobs given to her. Mr. Nunn, who ran the Bleachery Department, perhaps the most active department for postings, had no problems with plaintiff's posting of jobs. Mr. Goodson admitted plaintiff's posting work was usually done routinely and correctly. Mr. Cooke testified plaintiff properly posted jobs most of the time and, when she did not, it was because bids were not delivered to her on time. Sharon Barger stated plaintiff posted when given postings. Prior to her initial meeting with Goodson in April 1980 when problems about posting were first raised, Ms. Price did what other facility agents had done and often did not post on Fridays. Thereafter, the only time she did not post jobs was when departments were not running or when she had permission of one of her supervisors not to post.

31. Mr. Goodson's treatment of plaintiff and his insistence she post everyday was different from that accorded other facility agents, none of whom were shown to have filed EEOC charges. Although one of Ms. Price's duties was to supervise timekeepers, she alone was not allowed to have timekeepers post job notices for her as other facility agents had done. All other facility agents had always had the option not to post jobs on Fridays if the filling of those jobs were deemed unimportant by the pertinent supervisor. No other facility agent had ever been ordered to post jobs after 11:00 a.m. as plaintiff was.

32. After Ms. Price was told by Mr. Goodson to post every day except when the department was not running or she had permission not to post, she talked to Mr. Nunn, advised him that Mr. Goodson had told her to post jobs on Fridays if there were jobs to post, and requested that Mr. Nunn not send jobs to post on Fridays unless he really needed to fill the pertinent vacancies. Mr. Nunn fully understood that it was his option to give plaintiff jobs to post on Fridays or to refrain from doing so. Mr. Nunn testified that he never had any problems with plaintiff's work as an administrative foreman.

33. Mr. Goodson kept a file on plaintiff. The file consisted of notes other than regular personnel records. He began taking notes on his own initiative and was later instructed to do so by Ms. Marian Benton, defendant's EEO coordinator. Defendant did not keep a file on any other employees.

34. Plaintiff was never counseled or advised as to any job performance deficiencies.

35. From September 1979 until April 30, 1981 when the plaintiff was discharged, Mr. Goodson prepared only three memoranda in which such alleged poor performance was noted. The fact that only three such problems over numerous months were noted indicates that even with the special scrutiny given the plaintiff's actions, the company found little in its attempt to show that plaintiff was not doing her job well.

36. The first memorandum prepared by Mr. Goodson involved plaintiff's failure to post jobs on April 30, 1980. Plaintiff admitted that she had not posted jobs on that day. She had exercised the discretion used previously by other facility agents not to post when filling the involved job was not important. Mr. Goodson instructed the plaintiff to post every day thereafter, including Fridays, when the plant was scheduled to run full except when either he or Mr. Cooke advised plaintiff that she need not post. The plaintiff complied with his instructions thereafter.

37. The second memorandum pertained to a June 10, 1980 controversy regarding

posting. Alice Pethel, a timekeeper, told Mr. Goodson that a particular job had not been posted. She advised Mr. Goodson that she had put the pertinent job bid near plaintiff's work space prior to 11:00 a.m. and, thus, that the job should have been posted. At the time, plaintiff did not have a desk. Plaintiff was working in the dye lab, and job bids had been found misplaced under material from time to time. When confronted about the matter, plaintiff told Mr. Goodson that she did not receive the job bid until 1:15 p.m. and, therefore, could not post it that day. Goodson did not contend that Price's version of the facts was incorrect. The court cannot conclude from this testimony that Ms. Price had the posting prior to 11:00 a.m. or that she did anything improper. The June 10, 1980 memorandum prepared by Mr. Goodson also discussed a conversation which Mr. Goodson learned about second hand from Ms. Pethel. After Ms. Price's initial conversation with Mr. Goodson about the alleged late posting, Ms. Price discussed the matter with Ms. Pethel. Ms. Pethel then went to Mr. Goodson complaining about Ms. Price's subsequent conversation with Ms. Pethel. Ms. Pethel contended plaintiff had talked loudly to her, but admitted that she too had spoken loudly. While plaintiff had discussed the posting issue with Ms. Pethel, she encouraged Ms. Pethel to put job bids where they could be found and to contact plaintiff if there was any problem in the posting process. Ms. Price's behavior in that conversation was not outrageous or improper.

38. The third memorandum prepared by Mr. Goodson concerning plaintiff's job performance concerned plaintiff's alleged failure to post some Dye Department jobs for Don Carrigan in late April 1981. Apparently, a job posting was given to plaintiff. Plaintiff was under the impression that there were stoppages in several departments and that the Dye Department was not running and, therefore, did not post. According to defendant, plaintiff had been instructed not to post if the department involved was not then running. Mr. Carrigan apparently sought to have a later job

posted, but plaintiff understood the department was not running and that she had permission not to post. Mr. Carrigan, who usually did not personally deliver job postings to plaintiff, came to plaintiff and vehemently demanded a job be posted.

39. Other facility agents had occasionally failed to post jobs on a daily basis on occasion, but they were not disciplined, nor were other facility agents ever told to post jobs after 11:00 a.m. If other facility agents made mistakes in the implementation of the post-bid system, their mistakes were corrected without discipline. Defendant assumed that the plaintiff was the responsible party with respect to any controversy that was brought to the attention of management. Ms. Benton testified that a number of people complained about the plaintiff. However, she never investigated the incidents sufficiently to determine whether or not it was the plaintiff's actions which were causing problems or the action of others. Ms. Benton never talked with plaintiff about any work problems or job deficiencies.

40. The court finds that the parking situation which was referred to during testimony was trivial and was not the basis for plaintiff's termination.

41. Plaintiff was retaliated against after she filed her third EEOC charge and after her lawful picketing on April 24, 1981. Prior to the filing of plaintiff's January 28, 1981 EEOC charge, Ms. Price's relationship with the company's supervisors was good. Subsequent to that EEOC charge, some supervisors' attitudes toward plaintiff changed. After she picketed the supervisors' meeting, plaintiff was ignored by her fellow supervisors, many of whom would not talk to her. The defendant contended that the plaintiff was insubordinate when she did not attend Cannon's annual supervisors' meeting on April 24, 1981. The evidence revealed that a letter was purportedly sent to all supervisors inviting them to the supervisors' meeting. There is no evidence, however, that attendance at the supervisors' meeting, plaintiff called Mr. Goodson and said that she wanted to

take a vacation day that day. On previous occasions, supervisors had taken vacation on short notice, and it was Mr. Goodson's decision whether or not to allow the plaintiff to take this particular day as a vacation day. Mr. Goodson allowed the plaintiff's request. Plaintiff took the day off and lawfully picketed the supervisors' meeting.

42. In light of the fact that only six days before she was terminated, plaintiff lawfully picketed the supervisors' meeting, the court must address this finding. Mr. Murdoch contends that this played no role in his decision to terminate Ms. Price. The court finds this untenable. Mr. Murdoch and others were obviously displeased with Ms. Price's picketing activity on April 14, 1981 and said so. Thus, the court finds that defendant terminated plaintiff in part in retaliation of her lawful picketing. The court notes Mr. Murdoch's testimony: "Cannon Mills has a record and a reputation among the whole industry of a good relationship between management and employees." Trial Transcript at 3–196–97. This testimony was given although the United States had brought actions against the company in 1965, and a consent decree was entered in 1971 with reference to discrimination based on race at Cannon, and EEOC charges having been filed with merit. Of course, Mr. Murdoch was loyal to Cannon, and such must be considered in weighing his testimony. The court finds from the preponderance of the evidence that Ms. Price's picketing led to the decision to terminate her.

43. After hearing all the evidence, reviewing all the exhibits, observing all the witnesses who testified in this case, and considering all lawful and legitimate inferences arising from the evidence, the court finds from the preponderance of the evidence that "but for" plaintiff's filing of the EEOC charges, she would not have been terminated.

44. The court has requested the parties to agree, if they can, on the appropriate relief for plaintiff, which will be considered later by the court.

## Discussion

In order for plaintiff to prevail in a disparate treatment case such as this, she must show that but for her EEOC charge, she would not have been discharged. *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 669 (4th Cir.1983), *rev'd on other grounds sub. nom., Cooper v. Federal Reserve Bank of Richmond,* —— U.S. ——, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). The production of evidence in Title VII cases must follow the pattern set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.,* [411 U.S.] at 802 [93 S.Ct. at 1824]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.,* [411 U.S.] at 804 [93 S.Ct. at 1825]. (Footnote omitted.)

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–1094.

## Termination Sex Discrimination

This court finds no dispute as to whether plaintiff met her burden of establishing a *prima facie* case by a preponderance of the evidence. It is clear that she did. Further, defendant articulated a legally sufficient non-discriminatory reason for terminating plaintiff. At this point, the

**1156**

presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. at 1095. The issue remaining becomes whether the reason for the termination was pretextual. Thus, this court is able to decide the ultimate question: whether the particular employment decision in question was made on the basis of retaliatory motive. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

■ The trier of fact in a case such as this must examine the evidence and "decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. In other words, this court must decide if the reason given for plaintiff's termination was the true reason. This court believes it was not. Defendant has articulated several reasons for terminating plaintiff. The major reason asserted was plaintiff's manipulation or attempted manipulation of the post-bid system. This court holds, however, that the manipulation or attempted manipulation, if either did occur, was no basis for termination. Instead, the true reason for plaintiff's termination was her filing of prior EEOC charges and her lawful picketing. The court further holds that the plaintiff's sex was not a reason for her discharge.

Section 704(a) of Title VII provides:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). This plaintiff must show: (1) that she engaged in activity protected by Title VII; (2) that an adverse employment action took place; and (3) that a causal connection existed between participation in the protected activity and her discharge. *Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 580 (5th Cir. 1981).

■ Plaintiff met the three requirements set forth in *Dickerson*. *First*, the filing of her EEOC charges constitutes protected activity. Further, her picketing of the supervisors' meeting on April 24, 1981 would also fall within the meaning of protected activity. "To fall under the protection of the opposition clause in § 704(a), behavior need not rise to the level of formal charges of discrimination." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). *Second*, an adverse action occurred when plaintiff was terminated. Ms. Price's termination on April 30, 1981 occurred at a meeting with Mr. Murdoch, Mr. Goodson, and Mr. Hudson. After Mr. Murdoch listened to an account of what happened from Mr. Stanback, he discharged plaintiff. Ms. Price requested to be heard but was not given the opportunity. Evidence established that generally a supervisor's version would be given more weight than an hourly employee when a conflict occurred. In this case, plaintiff was not even afforded the opportunity to give her version. Thus, defendant has strayed drastically from its normal course. This court holds that such a variance in policy is worthy of an inference of retaliatory motive. *Third*, plaintiff had established the necessary link between her protected activity and the adverse action taken against her. Plaintiff was terminated just four months after her January 1981 EEOC charge was filed. In addition, her discharge occurred a mere six days after her picketing the supervisors' meeting. These activities are sufficient to connect the plaintiff's activity with the adverse actions taken against her.

After a *prima facie* case of discrimination has been established, defendant must articulate a legitimate non-discriminatory reason for the discharge. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–1094. Defendant has advanced several reasons which it construed as legitimate reasons for discharging an employee. *First,* defendant contends plaintiff manipulated or attempted to manipulate defendant's post-bid system. *Second,* defendant contends plaintiff was insubordinate, in that she was not submissive to her superiors. *Third,* defendant contends plaintiff failed to park in her assigned space. *Fourth,* defendant contends that the combination of these contentions led to Ms. Price's termination.

The court holds that defendant met its relatively light burden. Thereafter, it becomes incumbent upon plaintiff to show by a preponderance of the evidence that the reasons offered by defendant were pretextual. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

With reference to defendant's contention that plaintiff manipulated or attempted to manipulate the system, the court holds this reason was pretextual. It is apparent that defendant was watching plaintiff for any misdeed that might provide an opportunity for discharge. This is evidenced by the fact that defendant admittedly took notes and kept a file on plaintiff and only plaintiff. This activity was improper, especially since no other employees were treated in such a manner. It is important to note that all of the memoranda prepared by Mr. Goodson were relating to periods before the filing of the May 4, 1981 EEOC charge which is the subject of this lawsuit. *See Davis v. United States Steel Supply,* 26 FEP Cases 1462, 1472 (3d Cir.1981). Defendant then seized on Ms. Price's otherwise trivial offense to effectuate its true purpose of relieving itself of what it felt was a burdensome employee. Defendant made its decision to terminate plaintiff even before discussing the matter with her. Instead, Mr. Murdoch relied totally on the explanation of Mr. Stanback and fired Ms. Price. No warning or reprimand was ever given to plaintiff.

With regard to defendant's contention that plaintiff was terminated because she acted in an insubordinate manner, this court holds there was no credible evidence tending to show such. The majority of the evidence showed that plaintiff worked well with others. The only evidence to the contrary stated that she had run-ins with some employees. Plaintiff never instigated any controversy. Therefore, the court must dismiss the insubordination theory as being unworthy of credence. The third contention, regarding plaintiff's parking, amounts to triviality. Ms. Price was never warned or in any way disciplined for her parking. Therefore, the court holds this contention, taken alone or in conjunction with the other contentions, lacks merit. As the court stated in *Clark v. Huntsville City Board of Education,* 717 F.2d 525, 527 (11th Cir. 1983): "Where the defendant's explanation lacks credibility or where discrimination is the more likely motive, a case is made for pretext." In the case at bar, it appears retaliation is the more likely reason for plaintiff's termination. The defendant's fourth contention, simply stated, is that plaintiff was discharged because of the aggregate effect of the contentions. This must fail also as being pretextual. It stands to reason that if the contentions, taken individually, fail as being pretextual, the aggregate sum of the parts must also fail for the same reason.

Defendant may have overcome the pretext argument if the evidence had shown that employees similarly situated to the plaintiff were treated as plaintiff was treated. However, no evidence showed that other employees who had manipulated or attempted to manipulate the system were even disciplined, much less discharged. Due to the gross disparity in the manner in which plaintiff was treated, as compared to the manner in which other similarly situated employees were treated, the reasonable inference is that some other factor was involved which ignited defendant's actions. The missing factor is easily conceived when the plaintiff's background with Cannon and defendant's animus are

**1158**

considered. That factor is Ms. Price's propensity to file EEOC charges and her picketing and protest of the supervisors' meeting.

This court will not condone a discharge that is effectuated on the basis of an *ex parte* explanation and trivial contentions. Defendant's termination of Ms. Price went far beyond the concept of business judgment. It wandered aimlessly into the areas protected by Title VII. The court understands that plaintiff at all times retains the burden of persuasion. However, this court has the authority to consider all the evidence presented and accord it whatever weight it deserves. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 482–83, 75 L.Ed.2d 1478 (1983).

Plaintiff has sustained her burden by the preponderance of the evidence. The court so holds.

### Conclusions of Law

1. The court has jurisdiction of the action pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. §§ 2201 and 2202.

2. Cannon Mills of Kannapolis, North Carolina is an employer as that term is defined by 42 U.S.C. § 2000e(b).

3. Cannon Mills did not violate Title VII of the Civil Rights Act of 1964 by discharging Patricia K. Price on the basis of her sex.

4. Cannon Mills did violate Title VII of the Civil Rights Act of 1964 by retaliating against Ms. Price for filing EEOC charges against defendant.

5. The court, having found liability, has requested the parties to agree, if they can, on the appropriate relief which the court should grant.