DELTA AIR LINES, INC., Plaintiff–Counter–Claimant, Defendant–Appellee, Cross–Appellant,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Defendant–Counter–Claimant, Plaintiff–Appellant, Cross–Appellee.

No. 87–8839.

United States Court of Appeals, Eleventh Circuit.

Dec. 8, 1988.

Rehearing and Rehearing En Banc Denied Jan. 23, 1989.

---

Felice Busto, Legal Dept., Air Line Pilots Assoc., Int'l, Washington, D.C., for defendant-counter-claimant, plaintiff-appellant, cross-appellee.

Jefferson D. Kirby, III, Ford & Harrison, Paul D. Jones, Gregory L. Riggs, Law Dept., Delta Air Lines, Inc., Hartsfield/Atlanta Intern. Airport, Atlanta, Ga., for plaintiff-counter-claimant, defendant-appellee, cross-appellant.

Before HILL and FAY, Circuit Judges, and DUBINA[*], District Judge.

HILL, Circuit Judge:

## I. FACTS

This case concerns the discharge of William D. Day, a former Delta Airlines pilot, who was discharged by Delta for operating an aircraft while drunk. The facts, which were established at Day's grievance hearing before the Delta System Board of Adjustment, are not in dispute.

On January 9, 1985, Day was the Pilot–In–Command of Flight 410 from Boston to Bangor, Maine, which arrived about 2:00 p.m. The other cockpit crew members were First Officer David Rothbart and Second Officer Peter V. Voorhees. The four flight attendants (F/A's) were Robin Surette, Maureen Dion, Linda Rehal and Debbie Kleibech. The crew had a scheduled layover at the Bangor Holiday Inn. Flight 437 to Boston departed at 7:05 a.m. on January 10. This same crew was to operate that flight.

Before dinner on the evening of January 9, Day met some of the other crew members in the lounge of the hotel and drank

[*] Honorable Joel F. Dubina, U.S. District Judge for the Middle District of Alabama, sitting by designation.

three beers. The three pilots, two of the F/A's and Angela Miller (a friend of Voorhees) then went to dinner, where they shared three carafes of wine. After dinner, the group returned to the lounge for a "nightcap." Day and Miller remained in the lounge to finish their drinks after the others had left. A stranger at the next table offered to buy Day a drink; Day accepted and consumed more alcohol. Although Day maintains that he "blacked out" around 10:00 p.m. on January 9, he acknowledges that he must have changed his beverage of preference to scotch whiskey later in the evening. Bar bills indicate that Day continued to drink scotch until 12:30 a.m. The next thing Day remembers is his alarm clock sounding at 5:15 a.m. January 10. Rothbart knocked on Day's door around 6:15 a.m., but Day told him to go on to the airport without him. Testimony of F/A's Surette, Dion and Rehal establish that Rothbart, upon returning from Day's room, told the other crew members, "We're going without him. He's still out cold."

Day eventually made his way to the airport and entered the aircraft shortly before departure and just as the last passenger was boarding. His fellow flight deck officers did not interfere with his boarding; moreover, Day was supported by Rothbart as he entered the aircraft. His face was very red; his eyes were glassed over; and he appeared to be very disoriented. F/A Surette smelled liquor on Day's breath as he passed by her. F/A Rehal testified that after observing Day's difficulty in getting into his cockpit seat, she said to F/A Dion, "He's drunk."

The cockpit door was immediately closed and locked. F/A Surette knocked on the cockpit door, attempting to see if Day was too drunk to fly the airplane. Voorhees opened the door, but stood in the doorway blocking Surette's view. Upon questioning by Surette, Voorhees replied, "Everything is fine." Noticing F/A Rehal, Voorhees said, "The blonde doesn't look convinced."

Surette answered, "She's not, and neither am I."

Nevertheless, the flight departed Bangor with Day as Pilot–In–Command. The aircraft, a Boeing–727, was filled with passengers. All of the flight deck crew members testified that Day flew the aircraft the entire trip. After reaching cruise altitude, Voorhees walked back to the galley and obtained coffee to carry to the flight deck. F/A Surette told Voorhees that the F/A's believed that Day was drunk, but he again replied that everything was all right. Upon his return to the cockpit, Voorhees wrote a note to Rothbart stating, "We got trouble with the F/A's." Rothbart, upon reading the note, instructed Voorhees to disconnect the cockpit voice recorder, which he did. This was a direct violation of Federal Aviation Regulations. While the recorder was disconnected, the pilots discussed the problem presented by there being F/A's who were perceived as being disagreeable because their Pilot–In–Command was drunk. After about five minutes, they reconnected the recorder.

Flight 437 did arrive and land at Boston. Thereupon, the F/A's reported to Chief Pilot James Baker that Day was drunk while flying the aircraft. At the same time, the passenger who had been last to board and who also believed Day was drunk, reported his observations to a Delta Customer Service Manager, who, in turn, gave the information to Baker.

Captain Baker called the pilot crew into his office and promptly concluded that Day's appearance and behavior indicated Day was drunk. All three pilots were given blood alcohol tests. No alcohol was detected in the blood of either Rothbart or Voorhees. However, Day's blood contained alcohol. Expert analysis demonstrated that, given time for the alcohol to dissipate, Day had a blood alcohol content of approximately .13 grams at the time he flew the aircraft.[1] Day was discharged on January 15, 1985. Prior to his discharge, Day made no attempt to enroll in an alcohol

---

**1.** In Massachusetts, .1 gram is presumptive of operating an automobile under the influence of alcohol. Mass.Gen.Laws Ann. ch. 90 § 24(1)(e).

rehabilitation program operated by Delta or any other such program, though he had experienced other incidents of blackouts from drinking.[2]

The Federal Aviation Administration (FAA), by regulation, forbids the operation of *any* aircraft while drunk. Federal Aviation Regulations provide:

§ 91.11  Liquor and Drugs

(a) No person may act as a crew member of a civil aircraft—

(1) within 8 hours after the consumption of any alcoholic beverage;

(2) while under the influence of alcohol;

(3) while using any drug that affects the person's faculties in any way contrary to safety.

Delta forbids such conduct. Its *Flight Operations Procedures Manual*, Section 3, page 11 (10–12–84) states:

USE OF ALCOHOL OR OTHER DRUGS

Use of intoxicating beverages, including wines and beer, by flight crew members while in uniform or within 24 hours prior to departure of a flight is prohibited. The excessive use of intoxicants or drugs by any flight crew member, regardless of the above limitations, constitutes cause for discharge.

Any evidence of the use of alcohol or other drugs which is apparent at the time of reporting for flight duty, also constitutes reason for discharge.

Any flight crew member who knowingly permits another flight crew member to attempt to perform his flight duty while under the influence of intoxicants or drugs shall be considered equally guilty.

Day was discharged for violating both the Delta rules and the FAA Regulations.

Upon termination, Day submitted a grievance letter to Delta. The grievance was denied. The Air Line Pilots Association (ALPA), asserting that Day's flying of Flight 437 while drunk was not a sufficient

cause for his discharge, submitted the dispute to the System Board.

In a confusing three-to-two opinion, a majority of the System Board found that, although Day had committed a dischargeable offense, there was no just cause for discharge. According to the Board, Day should have been offered the option of entering the Delta alcohol rehabilitation program instead of being terminated. The Board determined that Delta, by firing Day, did not administer its alcohol rehabilitation program uniformly or fairly. This conclusion was based on the fact that, on at least three prior occasions, crew members who were apparently en route to reporting for duty while intoxicated, had been intercepted by fellow crew members or other Delta employees prior to take-off. These three, who had not served as crew members while drunk, were given the opportunity to enter Delta's rehabilitation program and/or given punishment less severe than discharge. In addition, the Board considered the fact that Voorhees and Rothbart were suspended rather than discharged. The majority also found it significant that, after discharge and after rejection of his grievance, Day was diagnosed as an alcoholic and had pursued a rehabilitation program with effective results.

After the finding of "dischargeable offense," the Board, nevertheless, concluded that the discharge was "without just cause although [Day] did commit serious misconduct." Day was awarded reinstatement, without back pay or related benefits, and Delta was ordered to pay for the costs of the alcohol rehabilitation program in which Day had participated. Delta was also ordered to cooperate with Day and with the FAA so that Day could be granted special issuance of a first-class airmen medical certificate.[3]

On February 12, 1987, Delta filed a complaint in the district court, seeking to have the arbitration award set aside. The district court overturned the decision of the

---

**2.** Only after Delta denied Day's discharge grievance did Day seek evaluation concerning his alcoholic tendencies. Day was diagnosed an alcoholic and entered in-patient treatment in March 1985.

**3.** Day's pilot's license and medical certificate had been suspended by the FAA.

System Board, except for that portion of the award requiring Delta to reimburse Day for the costs of his alcohol rehabilitation. The district court found that enforcement of the award finding no just cause for discharge would violate clearly established public policy against allowing pilots of airliners to operate aircraft while under the influence of alcohol. 686 F.Supp. 1573. The ALPA, arguing that Day's conduct was not just cause for discharge, filed a Notice of Appeal. Delta filed a Notice of Cross–Appeal concerning the order for reimbursement.

## II. DISCUSSION

### A. Scope of Review and Binding Authority

In deciding whether it was proper for the district court to overturn the arbitrator's decision, we note that

> [t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.... The courts, therefore, have no business weighing the merits of the grievance.

*United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). However, we must also be aware that there are public policy considerations which may be applicable under the facts of a given case. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

Our inquiry focuses on the three-to-two award of the Delta System Board of Adjustment. Examination of the award reveals an ambiguity in the several findings of the majority. First, the majority found that Day "did commit a dischargeable offense." Then, in the following paragraph, they found that there was no just cause for Day's discharge. In addition, the majority stated, in a passage that might be taken as a disclaimer, that its opinion "should not be interpreted as expressing a judgment on the reasonableness of ... [Delta's] policies relating to alcohol consumption and abuse."

Notwithstanding this ambiguity, because the award specifically states that there was no just cause for discharge, we take it, for purposes of this review, that the System Board majority found just that—no just cause—and that Delta's discharge of Day was improper. We review the award as such.

We are particularly bound and informed by three cases pertinent to the issue at hand: *United Paperworkers International Union v. Misco, Inc.*, —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Florida Power Corp. v. International Brotherhood of Electrical Workers*, 847 F.2d 680 (11th Cir.1988); and *Butterkrust Bakeries v. Bakery, Confectionery and Tobacco Workers International Union*, 726 F.2d 698 (11th Cir.1984).

*Butterkrust* holds that an arbitrator is bound to decide just cause for discharge, *vel non*, at the time of discharge. The arbitrator's responsibility is discharged upon his determination of the existence of just cause. If this finding has been made, the arbitrator is not authorized to employ "his own brand of industrial justice" and decide what post discharge good works would entitle the properly discharged employee to rehire. While the arbitrator (or independent member of a split panel) may be an actual or potentially excellent personnel expert, his opinion as to what employment opportunities one ought to have if he or she, after discharge, constructively addresses the problems that led to discharge, is not pertinent to arbitration duties. The arbitrator's effort to impose his views on that subject upon the parties to the arbitration amounts to his basing his decision upon "his own brand of industrial justice," which is forbidden.

*Misco* deals with the public policy exception to judicial deference to arbitration awards. *Misco* follows the principles of *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) with respect to public policy:

> In *W.R. Grace*, we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy" ... 461 U.S. at 766 [103 S.Ct. at 2183].... We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)) (emphasis in original text).

*Misco*, 108 S.Ct. at 373 (1987). In *Misco*, the employee was apprehended on company premises in an atmosphere of marijuana smoke in another's car, and traces of marijuana were found in his own car on the company lot. The *Misco* court found the reversal of the arbitration award improper because the employee's conduct was unrelated to his employment duties. As the Supreme Court pointed out, the Court of Appeals did not ascertain any "well defined and dominant" public policy violated by the arbitrator's interpretation of the contract to the effect that he may decide the question of whether the company can continue to employ an employee who was caught in a car with marijuana.

In *Florida Power*, although the panel did not discuss the public policy issue, the facts suggest that the discharge was for conduct not integral to employment duties. The employee in *Florida Power*, while off company property and off company time, was stopped and arrested for driving while intoxicated. A search of the employee's car revealed cocaine, drug paraphernalia and a concealed weapon. Upon learning of the employee's arrest, the company discharged the employee for violation of a recently adopted drug policy. The employee's arrest resulted from conduct unrelated to his employment duties, and for this reason, the panel applied *Misco*. The court did not find it necessary to discuss public policy considerations, it not appearing that there is any public policy against employing someone who sells drugs away from the employment premises. With respect to the scope of the arbitrator's authority, the panel merely followed the established precedent and decided that the arbitrator's award was drawn from the essence of the contract as required.

■ To summarize, we are instructed that our function in reviewing an arbitration award is very limited. While *W.R. Grace* makes it clear that we should reverse, if to affirm, we enforce an agreement contrary to public policy, *Misco* teaches that we must find such public policy from a more clear expression than our own notions of what it might, or should, be. In *Misco*, it was not shown that there existed explicit public policy forbidding the continued employment of an employee who consumed marijuana. We glean, inferentially, from *Florida Power* that, no matter how strong a public policy may condemn trafficking in drugs, Florida Power may, nevertheless, agree to arbitrate the issue as to whether a party might work for Florida Power, though guilty of such trafficking off the job.

These cases help define the public policy exception enunciated in *W.R. Grace;* none disapproves it. Such a doctrine exists, but examples of arbitration results that so offend public policy that they should be set aside by a court are not readily to be found. This is not surprising. An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference. The offending arbitrator's award which properly results in our setting it aside must be so offensive that one is to be seen only rarely. Examples come to mind more readily than exist in the real world.

It can hardly be denied that public policy would forbid the enforcement of a contract submitting to arbitration whether a complaint to the EEOC of racial discrimination constitutes just cause for discharge. *See, e.g., Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir.1969) (employee who was discharged for filing charges with EEOC must be reinstated); *Price v. Cannon Mills Co.,* 607 F.Supp. 1146 (D.C.N.C. 1985) (discharge of employee in retaliation for filing EEOC charges violates Title VII). Should an employer make such an assertion and an arbitrator find the assertion valid, the court should promptly set the award aside. With this background in mind, we review the award of the Delta System Board of Adjustment.

### B. Public Policy

■ The issue before this court is whether the district court properly set aside the award of the System Board as contrary to public policy.

We agree with the district court that, in the case before us, we have the rare example of an award the enforcement of which would violate clearly established public policy which condemns the operation of passenger airliners by pilots who are under the influence of alcohol.

If this conclusion is correct, there must be some principled difference between this case and *Misco* and *Florida Power.* The difference is apparent.

The employee in *Misco* appears to have smoked marijuana in a car in the plant's parking lot. The employee in *Florida Power* was discovered to have drug paraphernalia in his automobile. In these cases, the apparent wrongdoing was serious and is seriously condemned. However, in deciding to commit the wrong, the wrongdoer was not making an employment decision. The employer, on the other hand, may reasonably have disliked furnishing employment to one who is committing such wrongs. Yet, should the employer decide to continue to employ such a wrongdoer, even though his actions are condemned by public policy, *that decision*—to continue employment—is not itself contrary to public policy. Furthermore, the wrongdoing by an employee can be ended without affecting his employment. The wrongdoing and the employment are parallel but not intertwined. The wrongful conduct is wrongful, in and of itself, and its lawfulness *vel non* does not depend in any way on the employment. If public policy is offended—as it seems to have been—the performance of employment duties has nothing to do with it.

The case before us is remarkably different. Here, it is the employee *qua* employee who is the wrongdoer. It is Day's employment which made his intoxication violate law and public policy. Day could not correct his offensive conduct without altering the performance of his employment duties. He could not continue his offensive conduct and yet perform his employment duties legally. Furthermore, Delta could not permit Day to continue to perform his employment duties while his offensive conduct continued, without being an accessory to the wrongdoing.

As noted above, *Misco* requires the finding of a well defined public policy and an award that conflicts with that policy. The public policy of which the Supreme Court speaks in *Misco* seems to be a public policy not addressing the disfavored conduct, in the abstract, but disfavored conduct which is *integral to the performance of employment duties.* The question we are instructed, by *Misco*, to ask is not, "Is there a public policy against the employee's conduct?", but, rather, "Does an established public policy condemn the performance of employment activities in the manner engaged in by the employee?" Such a policy does exist in this case; the arbitrator's finding of no just cause explicitly conflicts with that policy.

The case before us is the case *Misco* was talking about. The arbitrator has construed the collective bargaining agreement in such a manner that it appears that Delta has agreed to submit to arbitration the question as to whether it should authorize operation of aircraft by pilots while they are drunk. We must ascertain "by reference to the laws and legal precedent"

whether there is some explicit public policy that is "well defined and dominant" which would prohibit Delta from entering into such a contract. In order to find out, we must look at what the people have done on this subject through their elected representatives.

### 1. *Laws and Legal Precedents*

With the advent of the automobile came the need for laws against drunk driving. The substitution of mechanical power for that of horses and mules, as well as the increased speed capability of the automobile, heightened the dangers of vehicular traffic. In response to this, the people, through their elected representatives, passed laws which made it a crime to drive an automobile while intoxicated. Today, it is universally accepted throughout the country that the operation of a motor vehicle while drunk is a crime.

Likewise, the advent of the airplane, and its three dimensions of movement and danger, produced a need for laws against drunk flying. Public policy against the operation of any vehicle while intoxicated promptly extended to that mode of travel as the people, again through their elected representatives, passed laws against the operation of aircraft while intoxicated. Today, laws prohibiting flying while intoxicated have been adopted in nearly every state, including Maine and Massachusetts from which and into which Day piloted Flight 437. These states include:

Alaska—Alaska Stat. § 02.30.030(a)
Arizona—Ariz.Rev.Stat. § 28–1744(B)
Arkansas—Ark.Code § 27–116–101
California—Cal.Pub.Util.Code § 21407.5
Connecticut—Conn.Gen.Stat. § 15–77
Florida—Fla.Stat.Ann. § 860.13(1)(a)
Hawaii—Hawaii Rev.Stat. § 263–11
Idaho—Idaho Code § 21–112
Illinois—Ill.Ann.Stat. ch. 15½ ¶ 22.43d
Indiana—Ind.Code § 8–21–4–8
Iowa—Iowa Code Ann. § 328.41
Kansas—Kan.Stat.Ann. § 3–1001
Kentucky—Ky.Rev.Stat. § 183.100
Louisiana—La.Rev.Stat.Ann. § 14:98(A)
Maine—Me.Rev.Stat.Ann. tit. 6, § 202(9)

Maryland—Md.Transp.Code Ann. § 5–1006(a)
Massachusetts—Mass.Gen.Laws.Ann. ch. 90 § 44
Michigan—Mich.Comp.Laws § 259.185
Minnesota—Minn.Stat.Ann. § 360.075
Mississippi—Miss.Code Ann. § 61–11–1
Montana—Mont.Code Ann. § 67–1–204(7)
Nebraska—Neb.Rev.Stat. § 28–1465
Nevada—Nev.Rev.Stat. § 493.130
New Hampshire—N.H.Rev.Stat.Ann. § 422:34(X)
New Jersey—N.J.Stat.Ann. § 6:1–18
New York—N.Y.Gen.Bus.Law § 245(7)
North Carolina—N.C.Gen.Stat. § 63–27
North Dakota—N.D.Cent.Code § 2–03–10(2)
Ohio—Ohio Rev.Code Ann. § 4561.15(c)
Oregon—Or.Rev.Stat. § 493.160
South Carolina—S.C.Code Ann. § 55–1–100(A)
South Dakota—S.D.Codified Laws § 50–13–17
Tennessee—Tenn.Code Ann. § 42–1–201
Texas—Tex.Rev.Civ.Stat.Ann. art. 46f–3
Vermont—Vt.Stat.Ann. tit. 5, § 187
Virginia—Va.Code § 5.1–13
Washington—Wash.Rev.Code Ann. § 47.68.220
West Virginia—W.Va.Code § 29–2A–11
Wisconsin—Wis.Stat.Ann. § 114.09
Wyoming—Wyo.Stat.Ann. § 10–6–103

Not only have the state legislatures passed these laws, but the courts have consistently upheld them. *See State ex rel. Schafer v. Fenton,* 104 Ariz. 160, 449 P.2d 939 (1969) (damage to airplane which defendant crashlanded was only an incident to offense of operating aircraft while intoxicated and was not so closely related to the offensive act as to bring into play misdemeanor compromise statute, such that defendant was not entitled to dismissal of information charging flying while intoxicated, though he settled with owner of aircraft for damage incurred in the crash); *State v. Bahl,* 242 N.W.2d 298 (Iowa, 1976) (defendant's conviction for manslaughter upheld because common law manslaughter can result from operating a motor vehicle, including an aircraft, while intoxicated); *Ward v.*

*State*, 280 Md. 485, 374 A.2d 1118 (1977) (statute making it a crime to operate aircraft while intoxicated does not conflict with federal law which, while proscribing identical conduct, imposes civil, rather than criminal penalties; therefore, defendant's conviction under the statute upheld), *cert. denied, Ward v. Maryland*, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978); *Sanders v. State*, 96 Okl.Crim. 397, 256 P.2d 205 (1953) (where defendant pled guilty to charge of operating an aircraft while intoxicated, sentence which was not near the maximum was affirmed). It appears that, of those states where we find no specific statutory prohibitions, none allow operation of an aircraft while intoxicated. Instead, those states have general statutes which, properly construed, prohibit reckless or dangerous flying (for example, Alabama—Ala.Code § 4–2–10 and Delaware—Del. Code Ann. tit. 2, § 309), and these statutes appear to be used to penalize pilots who fly while intoxicated. On the federal level, FAA Regulations, to which we have referred, forbid piloting an aircraft while intoxicated. We emphasize that we have found no state that approves of operation of an aircraft while drunk.

In addition to state statutes and federal regulations, case law also helps define public policy. As earlier observed, it is not to be expected that an extensive body of case law has been, or will be, developed illustrating the setting aside of arbitration decisions offending public policy. Arbitrators are not prone to such extreme results. However, with the principles we have outlined in mind, we find precedential support in two cases, *National Labor Relations Board (N.L.R.B.) v. Dixie Motor Coach Corp.*, 128 F.2d 201 (5th Cir.1942) and *Iowa Electric Light and Power Co. v. Local Union 204 of the International Brotherhood of Electrical Workers*, 834 F.2d 1424 (8th Cir.1987).

In *Dixie Motor*, the issue before the court was whether there was sufficient evidence to support the award of the N.L.R.B. reinstating certain employees. One employee, a bus driver, was discharged for his continued use of liquor. Witnesses testified that the driver frequently became intoxicated, and that on occasions he drove his bus on his regular run before he had fully recovered from a drinking spree. The Rules and Regulations of the Railroad Commission of Texas clearly forbade the operation of a motor bus by an operator who drinks intoxicating liquor either on or off duty. The court held that:

> [t]he public interest, as well as that of the employer, requires of any one entrusted with the lives and safety of the travelling public that he conduct himself in a manner in keeping with his responsibilities.... The undisputed facts show that this employee's drinking habits were such as to place upon his employer the duty to discharge him.

*Id.* at 203. The court found that reinstatement of an employee who drives drunk to a position of public service "would do violence to the public welfare and to the purposes of the National Labor Relations Act." *Id.* Thus, the court reversed the order reinstating him. Driving a bus while drunk, like flying an airplane while drunk, offends public policy in such a way that discharge must be justified, if not demanded. The driver's misconduct—driving while drunk—was inextricably related to the performance of his employment duties. Discharge was therefore authorized, and the employer's decision to discharge for such an offense was not subject to being set aside.

The arbitration award in *Iowa Electric* called for the reinstatement of a nuclear power plant machinist who had been discharged for deliberately violating important federally mandated safety regulations. The employee, in a rush to get to lunch early, deliberately ordered a foreman to pull a fuse on the interlock door system so that he could leave the secondary containment area. This door system is used as a measure to protect the public from exposure to harmful radiation. The district court vacated the arbitrator's award on public policy grounds, and the Eighth Circuit Court of Appeals affirmed.

The court found a "well defined and dominant" national policy requiring strict adherence to nuclear safety rules. The

court then concluded that this strong public policy would be violated by judicial enforcement of an arbitrator's award requiring the reinstatement of an employee who had deliberately violated nuclear safety regulations. The employee's misconduct occurred in the midst of, and as a part of, the performance of employment duties, as did Day's, and discharge was found to be justified.

## 2. *Conflict with Public Policy*

In our investigation, we have not uncovered any statute, law, ordinance or court precedent to the effect that flying under the influence of alcohol is consistent with public policy. It may be remarkable to find in any field of public opinion and policy such unanimity and total absence of dissent.

The existence of public policy denouncing the operation of any aircraft, even those not occupied by passengers, while intoxicated is "explicit," "well defined and dominant," and "ascertained by reference to laws and legal precedents" we have here reviewed. When public policy is offended by what a person does, unrelated to the performance of his employment duties, an employer may well conclude that he should discharge that person as an expression of disapproval, though there be no public policy one way or the other. Where the person performs his employment duties and, *in doing so*, violates standards, restraints and restrictions on conduct, clearly and explicitly established by the people in their laws, a requirement that the employer suffer that malperformance and not discharge the offender does itself violate the same well established public policy. The public policy denouncing the operation of any aircraft while drunk addresses disfavored conduct which is inextricably related to the performance of employment duties, and thus fits within the limitations imposed by *Misco*. What Day did as performance of his employment is the very thing which offends public policy. He flew an airplane while drunk and endangered the lives of his passengers and crew.

While the employers in *Misco* and *Florida Power* may have *wished* to use the leverage of employment to vindicate public condemnation of marijuana smoking and drug dealing, neither was under a duty to do so. Delta, on the other hand, was under a duty to prevent the wrongdoing of which its Pilot–In–Command was guilty, and it could not agree to arbitrate that issue.

The collective bargaining agreement between Delta and the ALPA, as interpreted by the System Board, insofar as it would submit to arbitration the question of whether Delta should authorize operation of aircraft by pilots under the influence of alcohol, violates public policy and cannot be enforced. The award of the System Board, which would give effect to such an interpretation, cannot be enforced.

As the district court noted, we are not suggesting that an airline pilot may not be reinstated under different circumstances or that a discharged pilot cannot be rehabilitated and hired once again to fly. There is no public policy against rehiring former alcoholics, post-rehabilitation. However, the arbitrator in this case was not authorized to decide whether, having been rehabilitated, Day should be rehired. The arbitrator's decision in this case was limited to whether Delta had just cause to discharge Day, after he had flown an airplane while drunk and before he had given the airline any indication that he was an alcoholic. The System Board's finding of no just cause falls within the public policy exception, as limited by *Misco*, and was properly set aside by the district court.

Finally, we must examine that portion of the district court's judgment which required Delta to reimburse Day for the expenses of his alcohol rehabilitation. As the district court noted, Day, although asserting his right to treatment in Delta's alcohol rehabilitation program well after discharge, made the claim the subject of his grievance. As such, the issue was properly before the System Board for determination. Given the factual conclusions reached by the Board regarding Day's entitlement to treatment in Delta's program, the district court held that requiring Delta

to reimburse Day for the costs of private therapy did not exceed the arbitrator's authority. We agree. It may well be that the System Board would have come to another result on this issue had it reached what we hold was required on the principle issue, reinstatement. We do not speculate on that. Contrary to that which obtains vis-a-vis just cause for discharge, there are no public policy implications in paying for rehabilitation. Were we initial deciders, we should perhaps be guided by the fact that Day did not seek or request rehabilitation until after his discharge. We are not initial deciders. We end up where we started. "The courts, therefore, have no business weighing the merits of the grievance." *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. at 568, 80 S.Ct. at 1346. As to rehabilitation expense, there being no public policy implicated, we agree with the district court.

### III. CONCLUSION

For the reasons stated above, the district court's order is

AFFIRMED.