**BUREAU OF MAINE STATE POLICE**

v.

**Michael C. PRATT, et al.[1]**

Supreme Judicial Court of Maine.

Argued Oct. 6, 1989.

Decided Dec. 29, 1989.

---

1. The Maine State Troopers Association was also named as a defendant in its capacity as the bargaining representative of Pratt.

James E. Tierney, Atty. Gen., William R. Stokes (orally), Asst. Atty. Gen., Augusta, for plaintiff.

William B. Troubh, John W. Chapman, James A. McCormack (orally), Richardson & Troubh, Portland, for defendants.

John C. McCurry, Maine State Employees Ass'n, Augusta, for intervenor.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

Defendant Michael C. Pratt appeals an order of the Superior Court (Kennebec County, *Brody, C.J.*). The Superior Court vacated an arbitrator's award reinstating Pratt as a sergeant in the Maine State Police following his dismissal from the force. Defendant argues on appeal that the court erroneously ruled that the arbitrator exceeded his authority and that the award violated public policy. We agree and vacate the order of the Superior Court.

The Superior Court accurately summarized the facts found by the arbitrator as follows:

Pratt joined the Maine State Police in 1973 and was subsequently promoted to the level of Sergeant. In late 1984, Pratt was assigned to a drug case in the Organized Drug Unit involving an informant named Sharon Sargent (Sargent). Based on Sargent's information, Pratt and his partner, Drug Investigative Agent Kenneth MacMaster (MacMaster), obtained a search warrant. The search of the premises led to the seizure of drugs. Sometime after the arrest but prior to court proceedings, Sargent called Pratt complaining of inadequate protection. Pratt went to Bangor and discussed this with Sargent. After meeting at the Bangor Motor Inn, Pratt took Sargent to his room at the Koala Inn where they had a sexual encounter. Pratt remained in Bangor to work the next day.

On April 2, 1986, a suppression hearing was held in the drug case. When Pratt was called to testify, the following colloquy occurred:

Q How well do you know Sharon Sargent?

A Not very well, this is my only dealing with her.

Q If she said that she was personal friends with you, would she be telling the truth?

A That could be her opinion, I suppose, sir.

Q Well, did you have other than a professional relationship with Sharon Sargent

.     .     .     .     .

A I did not.

Q So if she suggested otherwise she wouldn't be telling the truth?

A That's right; that's right.

In January 1987, MacMaster learned that the defense attorney in the drug case was going to have Sargent testify as to the sexual encounter. MacMaster notified his superiors who began investigating Pratt concerning a possible perjury

violation.[2] On April 1, 1987, Captain Wilson of the State Police completed the investigation concluding that the question posed at the suppression hearing was somewhat ambiguous and that he believed Pratt would have answered truthfully if asked directly whether he had engaged in sexual relations with Sargent. However, Wilson also reported that the incident should be examined further concerning Pratt's poor judgment. After reviewing the report, Chief of Police Andrew Demers dismissed Pratt stating that he had 1) been sexually involved with a potential witness; 2) failed to inform the prosecution of his relationship with the witness; 3) testified in a less than truthful manner; 4) injured the reputation of the Maine State Police; 5) demonstrated poor judgment and violated Police General Order #1.[3] Chief Demers gave Pratt until April 10, 1987 to provide reasons why he should not proceed with the dismissal. Pratt did not provide Chief Demers with any reasons and was effectively dismissed on April 10, 1987.

On April 10, 1987, Pratt contacted Lt. Douglas Holmes, his commanding officer, and informed him that he was grieving his dismissal under the employment contract. Holmes investigated the dismissal and rendered a Step 1 grievance response stating that 1) the investigation in the drug case was completed at the time of the sexual encounter with Sargent; 2) all the information which would have been used to obtain a conviction had been relayed to the prosecutor; 3) the contact occurred while Pratt was off duty; 4) the contact was between two willing single adults; 5) Pratt committed "no criminal violation"; 6) he also believed that Pratt would have answered truthfully if asked directly under oath whether he had been sexually involved with Sargent; 7) if poor judgment was involved it should not require dismissal

based on Pratt's 14 years of outstanding service. Holmes concluded by writing "it is my opinion that you should be reinstated with full backpay." A copy of Holmes' opinion went to Pratt on April 15th and on April 16th to Chief Demers. Apparently five minutes after Chief Demers read the letter, Pratt reported for duty. Chief Demers informed Pratt that he was still dismissed and was not reinstated.

On April 17, 1987, Chief Demers ordered Lt. Holmes to initial a previously prepared clarification of his grievance response. The clarification stated:

In my step 1 response to you dated April 15, 1987, I stated my opinion with respect to your reinstatement. I must clarify that this was my individual opinion only, and is contrary to and does not represent the view or position of the Bureau or the Maine State Police.

Furthermore, I am not authorized to take such an action and my initial memo does not, in fact, order reinstatement. Therefore, you are still effectively dismissed.

Since I do not have the authority to grant you the remedy you have requested, namely, reinstatement, you are therefore, authorized to proceed to the next step without further delay.

The parties voluntarily bypassed the second step of the grievance process requiring review of the decision by the Chief of Police. In the third step, Mr. Larson of the Governor's Office of Employee Relations, held a hearing and approved the Chief's decision. The parties then submitted to an arbitrator whether Pratt had been dismissed with just cause.

The arbitrator entered an award in favor of defendant and ordered that "[i]n implementation of the Step 1 response, he shall be reinstated with full seniority and other rights and be made whole for earnings." Defendant filed a complaint in the Superior

---

2. An investigation was also undertaken by the U.S. Attorney's Office and the FBI.

3. The Maine State Police Operations Manual General Order #1 Regulation 5 states "Members shall at all times both on and off duty, conduct themselves in a manner so as not to discredit themselves, or impugn the integrity of the Maine State Police."

Court seeking confirmation of the arbitration award and the Bureau moved to vacate the award. The Superior Court vacated the arbitration award and remanded the case to a new arbitrator for a determination of just cause. It is from this order that defendant appeals.

### I.

■ The initial question is whether the arbitrator exceeded his authority in determining the effect of Lt. Holmes' Step 1 response under the collective bargaining agreement. In relevant part, that agreement provides as follows:

### ARTICLE 7

### MEMBERS' RIGHTS

The Chief or Deputy Chief shall be responsible to ensure that all allegations of misconduct and other violations shall be investigated. Such investigation shall be completed within a reasonable time....

....

If after the investigating officer has interviewed the complainant and the member in question and it is determined by a commissioned officer that such misconduct, or other violation, is not a dismissible offense or of such magnitude that a suspension would result, the findings shall be provided to the member's commanding officer for disposition within five (5) days of such determination, and the member so informed.

Upon completion of such investigation where probable cause exists to warrant suspension or dismissal, the results of such investigation and interviews shall be provided to the Chief or Deputy Chief.

....

When a personal investigation has been completed and probable cause found, the Executive Officer shall notify the Chief. If it is the determination of the Chief that a Disciplinary Board should be convened or that an Administrative Hearings Officer is to be designated....

....

The Chief will review recommendations for disciplinary action made by the Disciplinary Board or Administrative Officer, and he will take such action as he considers appropriate.

### ARTICLE 8

### MANAGEMENT RIGHTS

The Association agrees that the State has and will continue to retain the sole and exclusive right to manage its operations and retains all management rights, whether exercised or not, unless specifically abridged, modified or delegated by the provisions of this Agreement. Such rights include but are not limited to: ... to discipline and discharge employees for just cause....

### ARTICLE 9

### GRIEVANCE AND ARBITRATION PROCEDURE

1. *Definitions and Scope*

1.2 For the purpose of this Agreement a grievance is defined as a dispute concerning the interpretation or application of a specific term or provision of this Agreement or the regulations, rules, directives or orders referred to in Article 32, Maintenance of Benefits. A grievance may be presented by a member, group of members or by the Association.

2. *Procedure*

2.1 *Step 1* An employee shall present his grievance orally to his Commanding Officer within thirty (30) calendar days of the act or omission which gives rise to the grievance, or within forty-five (45) calendar days from the date when the grievant would reasonably.... The Commanding Officer shall provide a response to the dispute within seven (7) calendar days from the date the dispute was presented.

2.2 *Step 2* The employee may appeal the Step 1 decision within ten (10) calendar days of the Step 1 decision by filing written notice with the Chief of State Police or his designee.

In his written opinion, the arbitrator did not deal explicitly with the question of "just cause" but rather focused solely upon the language of Article 9 providing for a Step 1 response on the part of the grievant's supervisor. The arbitrator found that Lt. Holmes, as an agent of the State, had the authority as well as the obligation to issue a valid and binding response. The arbitrator reasoned that Lt. Holmes' authority derived from the Governor, who signed the agreement on behalf of the executive branch of the government of the State of Maine. Thus, the arbitrator found that "Col. Demers' effort to alter the nature of the response and his ordering of Lt. Holmes to issue a rescission does not comport with terms of Article 9 which calls for 'a response,' not two or three." The arbitrator recognized that it is unusual for a junior officer to have authority to countermand the order of the Chief. He observed, however, that with regard to dismissals the State originally had the option of excluding any steps below that of the Chief from the contract. Moreover, he noted that even under the existing language, the Chief initially could have ordered Lt. Holmes to deny the grievance.

The arbitrator interpreted Article 9 of the contract as applying to an order of dismissal issued by the Chief of the State Police. Such an interpretation does not contravene any explicit provision of the contract. On the other hand, the Bureau argues that because Articles 7 and 8 establish that only the Chief can dismiss or suspend a member; by implication, a Step 1 officer is without authority to overrule the Chief. The Bureau contends that with regard to a dismissal, the Step 1 response constitutes only a recommendation. Either interpretation of the contract could be entertained by a person possessing a fair and reasonable mind. In such a case, we are obliged to uphold the arbitration award.

In *Westbrook School Comm. v. Westbrook Teachers Ass'n.*, 404 A.2d 204 (Me. 1979), we articulated a narrow standard for determining whether an arbitrator exceeded his authority under 14 M.R.S.A. § 5938(1)(C) (1980). We explained that

while a court will not substitute its judgment for that of an arbitrator, it will conclude that the arbitrator exceeded his powers by travelling outside the agreement ... if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator[s] was not possible under a fair interpretation of the contract. . . .

*Id.* at 209. (quotations and citations omitted). *See also Lisbon School Comm. v. Lisbon Educ. Ass'n.*, 438 A.2d 239, 243 (Me.1981) (narrow standard of review governs determination whether court shall vacate award on ground that arbitrator exceeded his powers). The rationale for such a deferential standard has been expressed in terms of the interests in finality and in assuring an informed disposition of the dispute. *Westbrook*, 404 A.2d at 208. It is, after all, the arbitrator's construction of the contract that was bargained for and only when there is manifest disregard of the contract will we disturb the award. *Caribou Bd. of Educ. v. Caribou Teachers Ass'n.*, 404 A.2d 212, 215 (Me.1979). Here, we have no choice but to uphold the award.

### II.

■ The Superior Court also declined to enforce the award on the ground that, as interpreted by the arbitrator, the contract would violate public policy. Specifically, the court found that by construing the Step 1 response as binding, the award contravened the organizational structure and the chain of command within the Bureau. We have not previously addressed the question of when, if ever, a court should refuse to enforce an arbitrator's award because it is contrary to public policy. Such a proposition is derived from the elementary common law rule that "courts will not enforce illegal contracts, or contracts which are contrary to public policy, or which are in contravention of the positive legislation of the state." *Corbin v. Houlehan*, 100 Me. 246, 251, 61 A. 131, 133 (1905). In order to preserve both the function of arbitration and judicial review, federal courts have found it necessary to confine public policy to that which is "well defined and domi-

nant" and "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983) (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945). *See also United Paperworkers Int'l. Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) and *Delta Air Lines v. Air Line Pilots Ass'n. Int't.,* 861 F.2d 665 (11th Cir.1988), *cert. denied* — U.S. —, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989).

Whatever practical justification may exist for preserving a strict military chain of command within the Bureau, such a requirement is neither expressed nor defined affirmatively in the laws of this State. We conclude that the arbitrator's interpretation, although at odds with a military command structure, does not violate any explicit public policy.

The entry is:

Judgment vacated.

Remanded with instructions to confirm the arbitration award.

ROBERTS, GLASSMAN, HORNBY and COLLINS, JJ., concur.

CLIFFORD, Justice, with whom McKUSICK, Chief Justice, joins, dissenting.

I respectfully dissent.

This matter was submitted to arbitration to determine whether there was just cause to dismiss Sergeant Pratt. The arbitrator never reached that issue, but instead held that Pratt had been reinstated by Lt. Holmes' response to Pratt's grievance. The result reached by the arbitrator is irrational, and I agree with the Superior Court that the arbitrator's construction of the contract was "not possible under a fair interpretation of the contract...." *West-*

*brook School Comm. v. Westbrook Teachers Ass'n,* 404 A.2d 204, 209 (Me.1979) (quotations omitted).

Article 7 of the collective bargaining agreement distinguishes between offenses for which a trooper may be suspended or dismissed, referring them for action by the Chief of the State Police, and less serious offenses that call for lesser sanctions, referring them for action by the trooper's commanding officer. This provision recognizes and is consistent with the retained management rights of the state to "discipline and discharge employees for just cause" expressed in Article 8.[1]

To interpret Step 1 of the grievance procedure set out in Article 9 of the collective bargaining agreement, as the arbitrator did here, to allow the commanding officer of a trooper dismissed by the Chief to reinstate that trooper with no appeal or other recourse by the Bureau, ignores Articles 7 and 8 and constitutes an irrational construction of the contract.

Moreover, the actual response to Pratt's grievance, on which the arbitrator relied to find that Pratt had been reinstated, could not be interpreted fairly to constitute a reinstatement. In the response, Lt. Holmes expressed his "opinion" that Pratt should be reinstated. Lt. Holmes testified that he deliberately chose the word "opinion" because he did not believe he had the authority to reinstate Pratt.

I would affirm the judgment of the Superior Court.

---

1. 25 M.R.S.A. § 1501 (1988) provides that the Chief of the State Police shall be the executive head of the Bureau of State Police.