### CITY OF LYNN *vs.* TERRANCE THOMPSON.

No. 98-P-505.

Essex. September 15, 1999. - October 23, 2000.

Present: BROWN, LAURENCE, & GELINAS, JJ.

Further appellate review granted, 433 Mass. 1101 (2001).

*Arbitration,* Judicial review, Award, Authority of arbitrator, Police. *Public Policy. Police,* Discharge.

Discussion of the scope of judicial review of an arbitration award in a labor relations matter. [284-286]

Where a police officer's conduct in breaking the arm of a mentally ill woman he was taking into custody resulted in his discharge after a disciplinary proceeding, an arbitration award reinstating the officer was in violation of a well defined public policy of protecting members of the public from physical harm from public officials and was beyond the authority of the arbitrator; a Superior Court judge correctly vacated the award and sustained the discharge. [286-289]

CIVIL ACTION commenced in the Superior Court Department on May 10, 1996.

The case was heard by *Robert H. Bohn, Jr.,* J., on motions for summary judgment.

*Michael J. Akerson* for the defendant.

*David F. Grunebaum* for the plaintiff.

GELINAS, J. On its application under G. L. c. 150C, § 11, to vacate an arbitrator's award, a judge of the Superior Court granted summary judgment for the plaintiff, city of Lynn, vacating an award reinstating Officer Terrance Thompson to his position on the city's police force. The arbitrator's award had reduced the penalty against Thompson from discharge to a two-week suspension. The Superior Court judgment sustained the city's action in discharging Thompson from the Lynn police department.

We find that Thompson's conduct, resulting in a mentally ill woman's arm being fractured, conduct characterized by the

arbitrator as "conduct unbecoming an officer," violated a well defined public policy protecting members of the public from physical harm from public officials. We affirm the judgment of the Superior Court.

We take the facts from the findings of the arbitrator. See *School Comm. of W. Springfield* v. *Korbut,* 373 Mass. 788, 789 (1977). Dispatched to the home of the victim, who we shall call E.R., a person with psychiatric problems (the call prompting the officers' visit reported that E.R. had threatened her mother with physical harm and might have to be committed to Arbor Hospital, a psychiatric facility in Jamaica Plain), Thompson and another officer, Steven Anderson, were the first on the scene. They were followed by a supervisor, Sergeant John Karuzis. Once admitted, an altercation developed between the officers and E.R. E.R. was loud and threatening. She initially resisted suggestions that she go to the hospital. After discussion, the sergeant indicated that they were going to take E.R. to a hospital. He mentioned a "pink slip" to E.R.'s husband.[1] E.R.'s husband agreed that E.R. should be committed. Seated in a chair in her living room, E.R. was smoking a cigarette; she picked up a cigarette lighter and some keys. Thompson demanded that she put out the cigarette and that she give up the cigarette lighter and keys. The supervisor ordered that she be handcuffed. The officers surrounded E.R., who was still seated in the chair. Officer Anderson was in the process of handcuffing her right hand. At this time, Thompson seized E.R.'s left hand and raised it to a straightened position over her head. With his other hand he attempted to pry open her fingers, bending her arm back and twisting it with his other hand until the arm broke. In testimony credited by the arbitrator, E.R. said that, as her arm was bent back, she screamed that she was being hurt and would do whatever the officers wanted; she begged the officer to stop, but he did not. The arbitrator found that Thompson was not trying to place a handcuff on E.R. and that E.R. was not physically threatening the officers with the keys and lighter. It was the

---

[1] General Laws c. 123, § 12(*a*), provides that "a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a ten day period." To "pink slip" a person believed mentally ill denotes this proceeding; the origin of the term derives, no doubt, from the color originally assigned to the paper on which the application form was printed.

second time Thompson had broken a person's arm while taking a person into custody in the course of his police duties.

Two separate legal actions resulted from the incident. E.R. filed suit in Federal court against both the city and Thompson, alleging violation of 42 U.S.C. § 1983 (1994).[2] The suit was resolved prior to trial; the city agreed to pay E.R. $350,000 in settlement of all claims, including claims against Thompson individually. In settling, neither the city nor Thompson admitted liability.

In addition to E.R.'s Federal suit, the city brought disciplinary proceedings against Thompson which resulted in his discharge.

The city charged Thompson as follows:

> "1. On the night of September 15, 1993, you did violate Section (G)(5) of the Rules and Regulations of the Lynn Police Department by use of more physical force than that which was necessary to accomplish a proper purpose in your attempt to handcuff [Ms. E.R.], such force resulting in injury to [Ms. E.R].

> "2. On and after September 15, you did violate Section (F)(6) of the Rules and Regulations of the Lynn Police Department in that you did fail to fully cooperate in a departmental investigation into the facts and circumstances surrounding [Ms. E.R.]'s injury on September 15, 1993.

> "3. On and after September 15, 1993, you did violate Section (G)(2) of the Rules and Regulations of the Lynn Police Department and did engage in conduct unbecoming an Officer by virtue of the acts and events involving your injury of [Ms. E.R.] referred to above and your subsequent conduct in reporting the events and providing information during the investigation of these events."

A hearing officer, designated by the mayor in accordance with G. L. c. 31, § 41, sustained all three charges, ruling in part that "[v]iolations of . . . the [r]ules . . . have caused injury to

---

[2]Title 42 U.S.C. § 1983 (1994) provides in pertinent part as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . or other proper proceedings for redress."

citizens," and recommended discharge. In his report, the hearing officer considered the prior incident in which Thompson had broken the arm of an individual whom he was taking into custody. A Federal claim against the city, also brought under 43 U.S.C. § 1983, stemming from that former incident, resulted in a substantial jury verdict against both Thompson and the city.[3] The mayor accepted the recommendation; Thompson was discharged on May 11, 1994.

Arbitration, as provided in the contract between the city and the police union, followed. The parties agreed as to the issue: "[W]as there just cause for the discharge of the grievant Terrance Thompson? If not, what shall the remedy be?"[4]

The arbitrator found that Thompson had broken E.R.'s arm in an effort to place her under control and to get objects (keys, a cigarette lighter) out of her hand. The arbitrator further determined that his action in this regard was solely motivated by his concern for removing objects which Thompson considered to be possible weapons, although, as the arbitrator found, E.R. was not using them as weapons and was not threatening anyone with them. The arbitrator also found, based on testimony of Dr. Robert Brendze, an orthopedic surgeon testifying on Thompson's behalf, that E.R. had used steroids, which may have weakened her bone structure, so that "it was likely that bone loss [had occurred and] affected the fracture threshold." Based on the circumstances of the incident and the bone condition, the arbitrator concluded that there was serious doubt that it was the use of excessive force that caused E.R.'s arm to break. He found that the evidence did not support the conclusion that Thompson had lost his self-control and intended to harm E.R. or the conclusion that Thompson had used excessive force in violation of the department's regulations.

---

[3]In Thompson's nineteen-year police career, seven civilian complaints were filed against him. We agree with Thompson that the dispositions of these complaints were such that they could not provide a basis for his discharge; although considered by the hearing officer, they were not considered by the arbitrator. As to the incident resulting in the Federal jury award, Thompson was suspended by the city following a disciplinary hearing. The suspension was reversed after arbitration; the arbitrator did not file a written decision and apparently no appeal was taken.

[4]Article 20, § 1, of the contract between the city and its police officers provided that "[n]o permanent employee [Thompson was a permanent employee] shall be removed, discharged, suspended, or disciplined in any other manner except for just cause."

The arbitrator further found that, contrary to the hearing officer's conclusion, the charge of failure to cooperate with the police department's internal investigation was not supported by evidence introduced at the arbitration hearing and, in fact, Thompson had complied with all department requirements in the course of the inquiry.

As to the charge of conduct unbecoming an officer, the arbitrator agreed with the hearing officer and found that Thompson's handling of E.R. in the circumstances was "lacking in sensitivity." He further found "overall confusion as [to] the Police Department's role in the involuntary commitment of [E.R]." Although finding that Thompson had violated the department's rules by engaging in conduct unbecoming an officer, the arbitrator found no just cause for discharge and converted the discharge to a two-week disciplinary suspension.

There is a "strong public policy favoring arbitration." *Plymouth-Carver Reg. Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990). See *United Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960) (discussing importance of arbitration in labor relation setting); *International Bhd. of Elec. Wkrs., Local 97* v. *Niagara Mohawk Power Corp.*, 143 F.3d 704, 714-715 (2d Cir. 1998) (reviewing strong policy favoring arbitration in labor matters). Our Legislature has codified that public policy with regard to agreements between labor and management in G. L. c. 150C, §§ 1 et seq., which provides, in § 1, that agreements for arbitration shall be "valid, enforceable and irrevocable."[5]

Reflective of this strong public policy favoring arbitration, judicial review of arbitration awards is severely limited. *Massachusetts Hy. Dept.* v. *American Fedn. of State, County & Mun. Employees, Council 93*, 420 Mass. 13, 15-16 (1995). See *Concerned Minority Educators of Worcester* v. *School Comm.*

---

[5]The statute provides as follows: "A written agreement or a provision in a written agreement between a labor organization or organizations, as defined in subsection (5) of section two of chapter one hundred and fifty A, and an employer or employers or association or group of employers to submit to arbitration any existing controversy or any controversy thereafter arising between parties to the agreement, including but not restricted to any controversy dealing with rates of pay, wages, hours or other terms and conditions of employment of any employee or employees, shall be valid, enforceable and irrevocable, except as otherwise provided by law or in equity for the revocation of any contract." G. L. c. 150C, § 1, inserted by St. 1959, c. 546, § 1.

*of Worcester*, 392 Mass. 184, 187 (1984). Courts may not vacate an arbitrator's award even if the award is based on an error of fact or of law. *Greene* v. *Mari & Sons Flooring Co.*, 362 Mass. 560, 563 (1972). *School Comm. of Waltham* v. *Waltham Educators Assn.*, 398 Mass. 703, 705 (1986). "[T]he judiciary must be cautious about overruling an arbitration award." *E.I. DuPont de Nemours & Co.* v. *Grasselli Employees Indep. Assn. of E. Chicago*, 790 F.2d 611, 615 (7th Cir.), cert. denied, 479 U.S. 853 (1986). "An arbitrator's result may be wrong; it may be unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference," *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., Intl.*, 861 F.2d 665, 670 (11th Cir. 1988), cert. denied, 493 U.S. 871 (1989), because "[t]he parties bargained for [the arbitrator's] final interpretation of their collective bargaining agreement. [The parties] got what they bargained for." *Cape Cod Gas Co.* v. *United Steelworkers of America, Local 13507*, 3 Mass. App. Ct. 258, 261 (1975), quoting from *Greene* v. *Mari & Sons Flooring Co., supra.*

General Laws c. 150C, § 11, enumerates the sole grounds upon which an arbitrator's award may be judicially set aside, *Massachusetts Hy. Dept.*, 420 Mass. at 15-16, and of those enumerated grounds only the public policy exception has relevance here. *Id.* at 16. Because generally parties may not enter into contracts which are against public policy, arbitrators may not "award relief of a nature which offends public policy." *Lawrence* v. *Falzarano*, 380 Mass. 18, 28 (1980), quoting from Eager, The Arbitration Contract and Proceedings § 121.6 (1971). Any award offending public policy "exceeds the powers" of the arbitrator and thus contravenes G. L. c. 150C, § 11(*a*)(3).[6] The award, moreover, need not violate any positive law, i.e., conduct which is specifically contrary to some statute, regulation, or other manifestation of positive law; it is "available when the arbitration decision and award create an explicit

---

[6]General Laws c. 150C, § 11(*a*), provides in pertinent part:

"Upon application of a party, the superior court shall vacate an award if: . . .

"(3) the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law."

conflict with an explicit public policy," *Service Employees Intl. Union, Local 36* v. *City Cleaning Co.*, 982 F.2d 89, 92 (3d Cir. 1992), which includes "the stated purposes behind these rules and prohibitions." *Exxon Shipping Co.* v. *Exxon Seamen's Union*, 993 F.2d 357, 363-364 (3d Cir. 1993). See *W.R. Grace & Co.* v. *Local Union 759, Intl. Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983). Any award in arbitration that is offensive to public policy is thus subject to being vacated by the courts.

Following Federal case law, Massachusetts uses a three-prong test to determine whether an arbitrator's award reinstating an employee may be overturned on public policy grounds. *Massachusetts Hy. Dept.*, 420 Mass. at 16-19. First, the public policy "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Id.* at 16, quoting from *W.R. Grace & Co.*, 461 U.S. at 766. Second, the conduct cannot be "disfavored conduct, in the abstract," but rather, the conduct must be "disfavored conduct which is *integral to the performance of employment duties*" (emphasis original). *Massachusetts Hy. Dept.*, *supra* at 17, quoting from *Delta Air Lines, Inc.*, 861 F.2d at 671. Third, there must be "a showing that the arbitrator's award reinstating the employee violates public policy to such an extent that the employee's conduct would have required dismissal," *Bureau of Special Investigations* v. *Coalition of Pub. Safety*, 430 Mass. 601, 605 (2000), that is, where "the job itself makes the employee's conduct an immediate threat to the general public." *Massachusetts· Hy. Dept.*, *supra* at 18.

We inquire, then, whether the arbitrator in this case has acted against public policy in reinstating an officer who has twice broken the arms of citizens with whom he was dealing in the performance of his duties, the last incident characterized as "conduct unbecoming an officer," and whose actions resulted in claims against him and his employer in Federal court for violations of 42 U.S.C. § 1983. To discern public policy "we must look at what the people have done on this subject through their elected representatives." *Delta Air Lines, Inc.*, 861 F.2d at 672. There appears a well defined and dominant public policy protecting members of the public from injury by police and other public officials. Title 42 U.S.C. § 1983 (1994) establishes a remedy against anyone acting "under color of any statute,

ordinance, regulation, custom, or usage, of any State'' who violates the civil rights of any citizen or other person. Cases brought under this statute often involve the use of force by police that results in injury to citizens. See, e.g., *Napier* v. *Windham*, 187 F.3d 177 (1st Cir. 1999); *Barber* v. *Guay*, 910 F. Supp. 790 (D. Me. 1995); *Mederios* v. *Dracut*, 21 F. Supp. 2d 82 (D. Mass. 1998). The city has an affirmative duty to act with reasonable care to prevent harm caused by its police, see *Irwin* v. *Ware*, 392 Mass. 745, 759 (1984), and liability under G. L. c. 258, § 2, will result where the city fails to act reasonably.[7] The city, as do most communities, has regulations prohibiting unwarranted behavior that results in serious injury to members of the public.[8] These statutes, cases, and rules evince, with respect to police activity, a broad, well defined and dominant public policy of providing protection to citizens. The policy is especially pronounced where one party is, by reason of infirmity, in an especially vulnerable condition. See, e.g., G. L. c. 19C, §§ 1-12 (abuse of disabled persons); G. L. c. 30, § 9B (abuse of person with disability in the care of Commonwealth as mentally ill, mentally retarded, or otherwise).

In his findings, the arbitrator credited the testimony of the victim and others that the victim was not attempting to use the articles in question as weapons and that, in fact, she had ceased to resist and was prepared to comply in all ways with the officer's requests. He further determined that, because of the confusion, the officer may not have been aware of her lack of resistance, crediting police testimony that they did not hear the victim's statements that they were hurting her and that she would cooperate with them. We do not challenge these findings. The arbitrator determined that the victim's arm was broken by the officer, not in an attempt to handcuff her, but in an attempt to remove items from her hand, after E.R. had ceased to resist, while each arm was being held by a different officer, and in the presence of a supervisor. The conduct, resulting in a broken

---

[7]We recognize that G. L. c. 258, § 10(*c*), precludes liability on the part of public employers for the intentional torts, including assault and battery, of their public employees. Nothing in the findings of the arbitrator or in this record suggests anything other than that E.R.'s injury was caused by conduct unbecoming an officer, that is, his insensitive handling of a person exhibiting signs of mental illness.

[8]Rule G(5) of the rules and regulations of the city's police department prohibits "[t]he use of more physical force than that which is necessary to accomplish a proper police purpose."

arm, the arbitrator concluded, lacked sensitivity and was conduct unbecoming an officer in violation of rule G(2) of the department's rules.[9]

On the prior occasion when Thompson had been subject to disciplinary action for breaking another person's arm, an arbitrator dismissed, without written decision or comment, a disciplinary suspension. Trial in Federal District Court followed, with the jury finding both Thompson and the city of Lynn to be in violation of 42 U.S.C. § 1983. The jury in that case found that Thompson had used excessive force and awarded the victim punitive damages against Thompson in the amount of $300,000.[10]

In circumstances such as these, where the conduct went "to the heart of the worker's responsibilities," *United States Postal Serv.* v. *American Postal Workers Union*, 736 F.2d 822, 825 (1st Cir. 1984), the city may not bargain away its affirmative duty to prevent harm to others caused by its police. Were it permitted to do so, it would be derelict in its duty to protect members of the public. Public policy precludes a contract that permits an arbitration award preventing discharge here, and thus the arbitrator's award was beyond his power. G. L. c. 150C, § 11(*a*)(3).

While the arbitrator's decision, by its terms, does not encompass conduct that violates any statute, rule, or regulation, it permits the continued presence on the police force of someone whose past and current conduct permits a strong inference that members of the public will be placed at risk of serious physical harm by an individual whose conduct is unbecoming an officer. The city should not be compelled to reinstate an individual who has, in the rather routine situation of this case, failed to exercise restraint and judgment in determining appropriate conduct for a police officer and where his conduct has resulted in serious injury.

The arbitrator's findings indicate that the conduct occurred in the course of, and was directly related to, the officer's employment duties. We determine that two incidents of like nature,

---

[9]Defining such conduct, rule G(2) of the rules and regulations of the police department provides that "[a]ny specific type of conduct which reflects discredit upon the member as a police officer, or upon his fellow officers, or upon the police department he serves," is "prohibited or restricted."

[10]The jury's total damage award against both defendants was $100,000, later reduced to $50,000.

resulting in serious injury to members of the public, suffice to show that Thompson's continuing as a police officer poses a special risk of violent injury to the public and that the city-employer has been, and will continue to be, made "an accessory to the wrongdoing." *Delta Air Lines, Inc.*, 861 F.2d at 671. This result here is not warranted; public policy considerations act to prevent such a result.

We are less persuaded by the city's arguments concerning the exposure of its citizens to civil liability. With regard to the taxpayer's interest, there is no clearly defined, by statute or otherwise, strong public policy of not subjecting a municipality and its citizens to financial risk in circumstances such as these. Although laudatory, protection of the public treasury in this case is at best a "general consideration of supposed public interest." *Massachusetts Hy. Dept.*, 420 Mass. at 16.

The order allowing summary judgment for the plaintiff, overturning the arbitration award, and sustaining discharge of the officer by the city, is affirmed.

*So ordered.*